UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SHAYARTO PERKINS,

       Plaintiff,

v.                                  Case No. 2:08-cv-97
                                             HON. R. ALLAN EDGAR

RAYMOND BOOKER, et al.,

       Defendants.

_____/

## REPORT AND RECOMMENDATION

       Plaintiff Shayarto Perkins, an inmate currently confined at the Baraga Maximum Correctional Facility (AMF), filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 against Defendants Ryan Correctional Facility Warden Raymond Booker, Southern Michigan Warden Sherry Burt, Rhonda Anderson, LMF Inspector James Contreras, Resident Unit Manager Curt Rife, LMF Records Office Supervisor J. Hinsa, LMF Assistant Resident Unit Supervisor Keith M. Castello, LMF Corrections Officer William Maki, LMF Resident Unit Officer K. Hill, LMF Resident Unit Officer Unknown Sebaly, LMF Resident Unit Officer Unknown Miron, MDOC Assistant Librarian S. Saltner, LMF Librarian J. Yoak, LMF Corrections Officer T. Gould, LMF Hearing Officer Linda Maki, LMF Assistant Deputy Warden Lyle Rutter, and LMF Warden Dave Bergh.

       Plaintiff's complaint alleges that in July of 2006, he made numerous attempts from prison to communicate with his daughter Siwatu-Salama Ra, but Defendant Anderson, who is the mother of Plaintiff's daughter, was not giving the letters to his daughter.

       In August of 2006, Plaintiff learned that Defendants Booker and Burt were giving Defendant Anderson confidential and other information regarding Plaintiff, including the names and

addresses of Plaintiff's family, their dates of birth and social security numbers. In addition, Defendants Booker and Burt also gave Defendant Anderson information regarding Plaintiff's location, misconduct report history, and their opinion on whether Plaintiff might be released on parole. Defendant Anderson asked Defendants Booker and Burt to make Plaintiff's time at LMF as hard as possible and to keep him incarcerated as long as possible.

Defendants Booker, Burt and Anderson contacted Defendant Contreras and asked that he make Plaintiff's time as hard as possible. Defendant Contreras then began systematically telling staff at LMF that Plaintiff did not have anything coming and that they should deny Plaintiff's requests and grievances as much as possible. Plaintiff states that he subsequently was subjected to a barrage of "retaliation and other illegal acts." Specifically, Plaintiff states that on September 8, 2006, Defendant Hines refused to give Plaintiff credit for time served. On December 6, 2006, Plaintiff was moved to Maple unit, where Defendant Rife ordered staff to harass him with false misconduct reports. On January 15, 2007, Defendant Maki falsified a notice of intent on Plaintiff, claiming that he had violated Kosher dietary rules and causing Plaintiff to be removed from a Kosher diet. On January 19, 2007, Defendant Castello told Plaintiff that Defendant Maki was a friend of his and that he was not going to jeopardize that for Plaintiff despite the evidence showing that Plaintiff did not violate any Kosher rules. Defendant Maki then upheld the false notice of intent. On February 10, 2007, Defendant Gould told Plaintiff that he had not forgotten the legal action and police report that Plaintiff had filed on him, and stated that Defendant Contreras had sent him to teach Plaintiff a lesson. He then conducted a body search on Plaintiff, grabbing hold of Plaintiff's penis and pulling on it. Plaintiff claims that this caused him to suffer pain and that he was subsequently denied medical attention.

On February 14, 2007 and February 15, 2007, Defendants Hill and Sebaly wrote five fabricated misconduct reports on Plaintiff, which resulted in Plaintiff receiving an 18 month continuance of parole.  On February 23, 2007, Defendant Maki told Plaintiff that he should not have "made problems for Contreras and his friends down state or made a complaint on William Maki." Defendant Maki stated that because of his complaints, she was going to find Plaintiff guilty on every misconduct ticket.  Plaintiff claims that she has followed through on this threat.  On March 6, 2007, Defendant Hinsa refused to terminate Plaintiff's consecutive sentences, which Plaintiff has already served.  On April 9, 2007, Plaintiff submitted legal documents for copying.  Defendants Salter and Yoak refused to copy the documents.  On June 6, 2006, Plaintiff discovered that an incorrect parole guideline score sheet had been completed on him and was being used to deny Plaintiff parole.  On September 20, 2007, while Plaintiff was trying to enter his cell, Defendant Miron closed the door on him, and then denied him medical attention.

Plaintiff states that on September 28, 2007, Defendant Contreras covered up the February 14 - 15, 2007 fabricated misconducts.  On October 26, 2007, Defendant Miron removed Plaintiff from his Kosher diet, claiming that Plaintiff had purchased non-Kosher foods from the prisoner store.  Plaintiff's mother contacted LMF officials seeking to have the retaliatory conduct stopped, to no avail.  On December 21, 2007, Defendants Booker, Burt and Anderson told Defendant Contreras to cut off all communications between Plaintiff and his daughter.  Defendant Anderson altered some of Plaintiff's letters as a pretext in order to justify the action.  Defendant Contreras then prepared a notice of intent to that effect and gave it to Defendant Castello to be carried out. Defendant Castello cut off Plaintiff's communication with his daughter on January 4, 2008.  Plaintiff states that his daughter is a 16 year old minor and that his parental rights have never been terminated.

On February 1, 2008, Defendant Contreras intercepted a letter to his daughter and wrote Plaintiff a major misconduct report.  Plaintiff was found guilty of the misconduct.

Plaintiff claims that Defendants Rutter and Bergh were repeatedly made aware of the illegal acts against Plaintiff, but failed to take any corrective action.  Plaintiff claims that Defendants' conduct violated his rights under the First, Eighth and Fourteenth Amendments, as well as under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc-1.  Plaintiff seeks compensatory and punitive damages, as well as equitable relief.

On June 9, 2008, the court dismissed Plaintiff's claims against Defendants Booker, Burt, Anderson, Contreras, Rife, Hinsa, Hill, Sebaly, Saltner, Yoak, Gould, Maki (Linda and William), Rutter, and Bergh with prejudice and ordered service of the complaint on Defendants Miron and Castello.  (Docket #17 and #18.)

Presently before the Court is the Motion for Summary Judgment filed by Defendants Miron and Castello pursuant to Fed. R. Civ. P. 56.  Plaintiff has filed a response, Defendants have replied to the response, Plaintiff has filed a surreply to the Defendants' reply, and the matter is ready for decision.  Summary judgment is appropriate only if the moving party establishes that there is no genuine issue of material fact for trial and that he is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  If the movant carries the burden of showing there is an absence of evidence to support a claim or defense, then the party opposing the motion must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial.  *Id.* at 324-25.  The nonmoving party cannot rest on its pleadings but must present "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)).  The evidence must be viewed in the light most favorable to the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

- 4 -

251-52 (1986).  Thus, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true.  *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004) (*citing Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994)).  However, a mere scintilla of evidence in support of the nonmovant's position will be insufficient. *Anderson*, 477 U.S. at 251-52.  Ultimately, the court must determine whether there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.  *See also Leahy v. Trans Jones, Inc.*, 996 F.2d 136, 139 (6th Cir. 1993) (single affidavit, in presence of other evidence to the contrary, failed to present genuine issue of fact); *cf. Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1448 (6th Cir. 1993) (single affidavit concerning state of mind created factual issue).

Plaintiff claims that he is entitled to relief under the Religious Land Use and Institutionalized Persons Act (RLUIPA) 42 U.S.C. § 2000cc-1, which states:

(a)     General Rule

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person–

(1)     is in furtherance of a compelling governmental interest; and

(2)     is the least restrictive means of furthering that compelling governmental interest.

The RLUIPA applies a strict-scrutiny standard whenever a substantial burden is imposed on religious exercise by a state government and occurs in a program or activity that receives Federal financial assistance, or affects, or removal of that substantial burden would affect, interstate or foreign commerce.  *Cutter v. Wilkinson*, 423 F.3d 579, 582 (6th Cir. 2005).

- 5 -

In their motion for summary judgment, Defendants state that they are entitled to summary judgment on Plaintiff's claims for money damages because the RLUIPA does not specifically allow for damages against prison officials in their individual capacities. In support of this contention, Defendants state that the RLUIPA is applicable only to programs or activities that receive federal assistance and state that the individual Defendants did not receive such funds. Defendants also state that the RLUIPA is spending clause legislation, and because the individual defendants were not parties to the grant agreement, holding them liable for individual damages under the Act would be contrary to principles of contract law. As noted by the United States District Court in the Northern Division of Georgia, this issue continues to be unresolved:

> [A] growing number of federal courts have expressed equivocation, if not doubt, as to whether the RLUIPA permits suits for damages against government officials in their individual capacities. *See Gooden v. Crain,*-F. Supp.2d-, 2005 WL 3436769, at *9 (E.D. Tex. Dec.13, 2005) (appearing to hold claims for damages, especially those against officials in individual capacities, unavailable under the RLUIPA); *Smith v. Haley,* 401 F. Supp. 2d 1240, 1246 (M.D. Ala. 2005) ("Because there is simply nothing in the statute that clearly suggests that government employees can be liable for damages in their individual capacities, the court doubts that RLUIP[A] provides for such."); *Boles v. Neet,* 402 F.Supp.2d 1237, 1240 (D. Colo. 2005) ("The Court understands [the RLUIPA] to permit cases against a governmental entity, but not against an individual officer, except perhaps in his or her official capacity."); *Chase v. City of Portsmouth,* No. Civ. A. 2:05CF446, 2005 WL 3079065, at *5 (E.D. Va. Nov.16, 2005) ("Appropriate relief may include injunctive and declaratory relief as well as nominal damages."); *Farrow v. Stanley,* No. Civ. 02-567-PB, 2005 WL 2671541, at *11 n. 13 (D.N.H. Oct.20, 2005) ("There is substantial uncertainty ⋯ as to whether [42 U.S.C. § 2000cc-2] even provides a right to money damages."); *Guru Nanak Sikh Soc'y of Yuba City v. County of Sutter,* 326 F.Supp.2d 1140, 1162 (E.D.Cal.2003) ("the issue of whether RLUIPA allows the recovery of damages is an open question"); *Agrawal v. Briley,* No. 02C6807, 2003 WL 164225, at *2 n. 2 (N.D.Ill. Jan.22, 2003) ("it is unclear whether [42 U.S.C. § 2000cc-2(a) ] authorizes a claim for damages as well as injunctive relief"). *But see Williams v. Bitner,* 359 F. Supp. 2d 370 (M.D.Pa.2005) (recognizing corrections employees

and officials' exposure to liability in individual capacities on inmate's
§ 1983 claim asserting violation of the RLUIPA.

*Daker v. Ferrero, et al.*, 2006 WL 346440, slip op. p. 9 (N.D. Ga. Feb. 13, 2006).

The cases reviewed by the *Daker* court rely, in part, on the language of the RLUIPA, which provides for appropriate relief against a "government." *Id.*; 42 U.S.C. § 2000cc-2(a). In addition, 42 U.S.C. § 2000cc-1(a) states that no "government" shall impose a substantial burden on the religious exercise of a prisoner. *Id.* (emphasis added). However, for purposes of the RLUIPA, the term government includes:

> (i) a State, county, municipality, or other governmental entity created under the authority of a State;
>
> (ii) any branch, department, agency, instrumentality, or **official** of an entity listed in clause (i); **and**
>
> (iii) **any other person acting under color of State law**.

*Daker*, 2006 WL 346440 at *9 (emphasis in original) (*citing* 42 U.S.C. 2000cc-5(4)). As noted by the *Daker* court, if the statute's definition of "government" was limited to (i) and (ii), "its remedial reach would no doubt be susceptible to a construction that embraces only those claims asserted against officials in their official capacities." *Id.* Consequently, the addition of section (iii), whose language tracks closely that found in 42 U.S.C. § 1983, appears to provide for actions against state officials in their individual capacities. *Daker*, 2006 WL 346440 at * 9.

The *Daker* court further notes because the RLUIPA provides for "appropriate relief," some courts have questioned whether Congress intended to permit only injunctive relief. However, the *Daker* court observed that while § 2000cc-2(a) does not explicitly permit individual capacity suits for money damages, it does not explicitly preclude them either. *Id.* In *Daker*, the court concluded that the RLUIPA's provision for appropriate relief should be read as an incorporation by

Congress of the vast body of law respecting the "manifold limitations on government and government actor's exposure to suit - including, e.g., the Eleventh Amendment, qualified immunity, and the Prison Litigation Reform Act." *Id.*

The undersigned notes that the Sixth Circuit has not directly addressed the liability of individual defendants under the RLUIPA. However, the Sixth Circuit has allowed a lawsuit filed under the RLUIPA against individual defendants to proceed without considering whether individuals are amenable to lawsuit. *Cutter v. Wilkinson*, 423 F.3d 579 (6th Cir. 2005). Because the undersigned is persuaded by the reasoning set forth in *Daker*, I recommend that Defendants be denied summary judgment on the issue of individual liability.

Moreover, Defendants' claim that they are entitled to qualified immunity on the issue of individual liability also lacks merit. Government officials, performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999); *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *Noble v. Schmitt*, 87 F.3d 157, 160 (6th Cir. 1996); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The test is whether the official could reasonably have believed his conduct was lawful, not whether the official could reasonably have believed his conduct would subject him to monetary damages, as opposed to injunctive relief. *Dietrich*, 167 F.3d at 1012; *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

Defendants further claim that they are entitled to summary judgment in this case because the denial of Kosher meals to Plaintiff was the least restrictive means of furthering a compelling governmental interest. Defendants contend that the denial of a Kosher diet to prisoners who are not sincere in their religious beliefs furthers the MDOC's interest in maintaining security

- 8 -

because prisoners who are sincere in their beliefs can be offended by those who are not sincere.  In addition, Kosher meals cost at least twice as much as regular meals, so that denying such meals to non-sincere prisoners furthers the compelling governmental interest of controlling costs.

As noted above, Plaintiff claims that Defendants' conduct violated his constitutional right to freedom of religion and his rights under the RLUIPA, 42 U.S.C. § 2000cc-1.  Prisoners do not lose their right to freely exercise their religion by virtue of their incarceration.  *Cruz v. Beto*, 405 U.S. 319, 322, n. 2 (1972).  Freedom of religion being a fundamental right, any regulation which infringes upon it must generally be justified by a "compelling state interest."  *See*, *for example*, *Wisconsin v. Yoder*, 406 U.S. 205 (1972).  However, as a prisoner, plaintiff's constitutional rights are subject to severe restriction.  *See*, *for example*, *Bell v. Wolfish*, 441 U.S. 520 (1979) (restriction on receipt of reading materials); *Hudson v. Palmer*, 468 U.S. 517 (1984) (privacy); *Wolff v. McDonnell*, 418 U.S. 539, 566 (1974) (right to call witnesses); *Richardson v. Ramirez*, 418 U.S. 24 (1974) (vote).  *See*, *generally*, *Washington v. Harper*, 494 U.S. 210 (1990); *Turner v. Safley*, 482 U.S. 78 (1987); *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987).

The standard by which prison regulations impinging on prisoner constitutional rights is judged is "reasonableness."  *Turner*, 482 U.S. at 88-95; *Washington*, 494 U.S. at 223-25.  In *Turner*, the Supreme Court expressly rejected any degree of "heightened scrutiny" in order to assure that "prison administrators . . . and not the courts . . . make the difficult judgments concerning institutional operations."  *Id.* at 89, *quoting Jones v. North Carolina Prisoners' Union*, 433 U.S. 119 (1977).

In *Turner*, the court set forth four factors "relevant in determining the reasonableness of the regulation at issue." 482 U.S. at 89-91.  First, there must be a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it.  *Id.*

at 89, *quoting Block v. Rutherford*, 468 U.S. 576, 586 (1984).  Second, the reasonableness of a

restriction takes into account whether there are "alternative means of exercising the right that remain

open to the prison inmate." *Turner*, 482 U.S. at 90.  Third, the court should consider the "impact

accommodation of the asserted constitutional right will have on guards and other inmates, and on

the allocation of prison resources generally." *Turner*, 482 U.S. at 90.  Finally, the existence or

absence of ready alternatives of accommodating the prisoner's rights is relevant to reasonableness.

*Turner*, 482 U.S. at 90.  As stated by the court, this final factor "is not a 'least restrictive alternative'

test."  *Id.* at 90.  "Prison officials need not show that "*no* reasonable method exists by which

[prisoners'] rights can be accommodated without creating bona fide [prison] problems." *O'Lone v.*

*Estate of Shabazz*, 482 U.S. 342, 350 (1987).

> In determining whether a prisoner's particular religious beliefs  are
> entitled to free exercise protection, the relevant inquiry is not
> whether, as an objective matter, the belief is "accurate or logical."
> *Jolly v. Coughlin*, 76 F.3d 468, 476 (2d Cir.1996).   Instead, the
> inquiry is "whether the beliefs professed by a [claimant] are sincerely
> held and whether they are, in his own scheme of things, religious."
> *Patrick [v. LeFevre]*, 745 F.2d at 157 (quoting *United States v.*
> *Seeger*, 380 U.S. 163, 185, 85 S.Ct. 850, 13 L. Ed.2d 733 (1965))
> (alteration in original) (emphasis added).   A claimant need not be a
> member of a particular organized religious denomination to show
> sincerity of belief.   *See Frazee v. Illinois Dep't of Employment Sec.*,
> 489 U.S. 829, 834, 109 S.Ct. 1514, 103 L. Ed.2d 914 (1989).

*Jackson v. Mann*, 196 F.3d 316, 320 (2d Cir. 1999).

In *Jackson v. Mann*, the Second Circuit held that the district court erred in substituting

the objective "accuracy" of the plaintiff's assertion that he was Jewish for the correct test – whether

the plaintiff's beliefs were sincerely held.  196 F.3d at 320.  The pertinent issue in *Jackson*, as in this

case, was whether the plaintiff was entitled to receive a Kosher diet.  *Id.* at 318.  The Second Circuit

concluded that the defendants in *Jackson v. Mann* were not entitled to summary judgment because

even if the plaintiff was not Jewish according to Judaic law, this did not resolve the issue of material

fact regarding the sincerity of the plaintiff's religious beliefs. *Id.* at 320-21.

Similarly, in *Mosier v. Maynard*, 937 F.2d 1521 (10th Cir. 1991), the Tenth Circuit

held that merely because the plaintiff was not a member of the Cherokee nation or the Native

American worship group at his prison, it did not mean that his belief was insincere. *Id.* at 1523.[1]

As noted by the Tenth Circuit in *Mosier*[2], the United States Supreme Court has rejected the idea that

membership in a religious organization is a prerequisite for religious convictions to be judged

sincere. *Frazee v. Illinois Dep't of Employment Sec.*, 489 U.S. 829, 834, 109 S.Ct. 1514, 1517-18

(1989).

Defendants have the right to ensure that each prisoner is sincere in his belief before

allowing him access to the Kosher Meal Program.   The use of MDOC Operating Procedure

05.03.150 is a legitimate means of determining whether a prisoner is entitled to the Kosher menu.

The MDOC Operating Procedure 05.03.150-A provides that a prisoner can be removed from the

program if staff observe the prisoner in possession of non-Kosher items.  (*See* Defendants' Exhibit

F.)  In addition, 05.03.150-A provides:

> K.  A prisoner who wants to participate in the Kosher Meal Program
> must submit a written request to the Warden or designee for approval.
> The request shall include a statement as to his/her religious beliefs
> which necessitate a Kosher diet.
>
> L.  Upon receipt of such a request, the Warden shall verify that the
> prisoner is eligible to participate in the Kosher Meal Program based
> on the prisoner's designated religion by requiring the Assistant

---

[1]The plaintiff in *Mosier* was seeking an exemption from the prison's requirement that hair be kept to a certain length.

[2]*See Mosier*, 937 F.2d at 1523.

- 11 -

Deputy Warden for Programs or the chaplain to interview the prisoner and obtain a response to the following questions:

> 1.  Briefly explain the major teachings of your designated religion.
>
> 2.  Why is a kosher diet required by this religion.
>
> 3.  What is a kosher diet?  In other words, how does it differ from food otherwise prepared by the institution?  What types of food are not allowed?

(*See* Defendants' Exhibit F.)

Defendants offer the affidavit of Dave Burnett, who was employed as Special Activities Coordinator during the pertinent time period.  Mr. Burnett attests that the Kosher Meal Program is reserved for those whose faith of preference requires eating from a Kosher menu and that allowing prisoners who are not sincere to participate in the program is offensive to those who are sincere.  Mr. Burnett states that this often leads to conflict between prisoners, which raises security concerns.  In addition, Mr. Burnett attests that there is also a compelling economic interest because providing Kosher meals requires extra effort and expense, and that Kosher meals cost up to three times that of a regular meal.  (*See* Defendants' Exhibit G, ¶¶ 7-9.)

Defendants assert that given the State's interest in reducing potential conflicts that could arise between prisoners and its interest in controlling the cost of food for prisoners, it is reasonable to require prisoners to comply with Kosher dietary rules in order to demonstrate that their participation in the program is supported by a sincere religious belief.

Defendants offer the affidavit of Chaplain Gerald Riley, who attests that he was the Chaplain at the Alger Maximum Correctional Facility (LMF) during the pertinent time period.  Chaplain Riley states that Plaintiff changed his religious preference at least five times: from Jewish to Nation of Islam on December 14, 2002, to "other faiths" on July 3, 2003, to Catholic on

December 19, 2003, and back to Jewish on June 6, 2005. (*See* Defendants' Exhibit A, ¶¶ 1, 8.)

Chaplain Riley attests that Plaintiff was placed on the Kosher Meal program on July 31, 2006, and

was removed from the program on January 19, 2007. Plaintiff became eligible for reinstatement to

the Kosher Meal program in July of 2007, at which time Chaplain Riley interviewed Plaintiff. At

this time, Plaintiff demonstrated knowledge of the Jewish faith and its dietary requirements, which

suggested some measure of sincerity. Therefore, Chaplain Riley approved Plaintiff's request for

Kosher accommodations. However, on October 26, 2007, Plaintiff was again removed from the

Kosher Meal program. (*See* Defendants' Exhibit A, ¶¶ 3-7.)

As noted by Defendants in their brief, Plaintiff was originally denied his request for

a Kosher diet in 2005 because he lacked knowledge of the Jewish faith. *See Perkins v. Prisk*, 2007

WL 1796238, *1 (2007). The court in *Perkins v. Prisk* noted:

> Perkins has a multifaceted religious background. When he entered the
> prison system, his presentence report listed him as "Protestant." At
> various times, he has formally declared himself on official prison
> forms to be an adherent of the "Nation of Islam," "Catholic," and a
> follower of the "House of Yahweh," as well as of Judaism. At one
> time he had his name changed to a Jewish sounding name, but has
> always been referred to in prison by the name, Shayarto Perkins.
> Prison records show that Perkins has attended religious services
> sponsored by these various faiths. In fact, Perkins was attending a
> Roman Catholic service when he requested a kosher diet in June
> 2005. Additionally prison records show that Perkins was married by
> a Muslim cleric.

*Perkins v. Prisk*, 2007 WL 1796238, at *1. The court also stated:

> In view of Perkins' background, it appeared to Burnett that Perkins
> was trying to obtain a prison transfer rather than to practice a faith
> sincerely. Perkins knew that no kosher diet was offered at Marquette,
> and that a kosher diet would have to be provided elsewhere in the
> MDOC.

*Id.*  The court finally noted that Plaintiff was approved for a Kosher diet in 2006, after he had achieved more familiarity with Judaism, at which point he was transferred to LMF, where that diet was provided.  *Id.* at *2.

Defendants state that having effectuated his transfer out of the Marquette Branch Prison (MBP), Plaintiff was removed twice from the Kosher Meal program for being in possession of non-Kosher food.  Defendants offer the affidavit of William Maki, who was employed as a Corrections Officer at LMF during the pertinent time period.  Officer Maki attests that he observed Plaintiff receive a piece of hamburger, a non-Kosher food item, from a non-Kosher meal tray in January of 2007.  Plaintiff attempted to conceal the item using other food from his Kosher meal tray.  Officer Maki then asked to inspect Plaintiff's tray and wrote a notice of intent (NOI) on Plaintiff regarding his non-compliance with a Kosher diet.  (*See* Defendants' Exhibit B, ¶¶ 4-5, 7, 9.)  On January 19, 2007, Defendant Castello conducted an administrative hearing on the NOI.  Defendant Castello attests that he took statements from Plaintiff and prisoner Holman, as well as from Officer Maki and found Maki's account to be more credible.  Defendant Castello then removed Plaintiff from the Kosher Meal program.  (*See* Defendants' Exhibit C, Defendant Castello affidavit, ¶¶ 1-5.) Defendants offer a copy of the hearing report on the NOI, which states Defendant Castello's reasons for findings:

> On 1-15-07, Officer Maki observed Perkins accept a piece of hamburger from another prisoner which was received from the main food line.  Perkins covered the burger with food items from his Kosher meal styrofoam tray.  Maki is very detailed and factual with regard to the facts in this matter.  Therefore, Maki is found to be credible in his account of Prisoner Perkins being in possession of a Non-Kosher item.

(*See* Defendants' Exhibit C, Hearing Report.)

- 14 -

Defendants offer the affidavit of Heidi Swajanen, who was employed as the storekeeper at LMF during the pertinent time period. Ms. Swajanen attests that on September 19, 2007, Plaintiff placed an order with the prisoner store for an 8 ounce tub of cheddar cheese spread, which is a non-Kosher item. On September 22, 2007, the order was delivered to Plaintiff. Ms. Swajanen also attests that Chaplain Riley had sent a list to the store and requested that she check the orders of those prisoners on a Kosher diet to determine if they were ordering food according to their designated religious tenet. In addition, Ms. Swajanen wrote a NOI on Plaintiff, proposing that he be removed from the Kosher Meal program. (*See* Defendants' Exhibit D, Swajanen Affidavit, ¶¶ 1-.) Defendants also offer a copy of the Notice of Intent written by Ms. Swajanen, and a copy of the store order showing that Plaintiff purchased the cheese spread as attachments to the Swajanen Affidavit. (*See* Defendants' Exhibit D.) Defendant Miron conducted a hearing on the NOI and subsequently ordered that Plaintiff be removed from the Kosher Meal program. (*See* Defendants' Exhibit E, ¶ 4.)

In response to the motion for summary judgment, Plaintiff offers his affidavit, in which he attests that the NOI written by Defendant Maki accusing Plaintiff of putting a portion of hamburger on his plate was false. Plaintiff states that Defendant Maki had previously threatened to get him removed from his Kosher diet detail by falsifying a NOI. Plaintiff further attests that he did not order the cheese spread, and that when his store order was delivered, he refused to accept the cheese because he had not ordered it. (*See* Plaintiff's affidavit, ¶¶ 3-4, 8-9.) Plaintiff offers the affidavit of prisoner Holman, who attests that contrary to the NOI written by Defendant Maki on January 15, 2007, Plaintiff never took any hamburger off of his tray. (*See* Plaintiff's Exhibit C, ¶ 2.) In addition, Plaintiff offers the affidavit of prisoner Robinson, who claims that he witnessed Plaintiff refusing the cheese. (*See* Plaintiff's Exhibit E, ¶ 2.) Prisoner Robinson also states that on

October 26, 2007, he was questioned regarding whether or not Plaintiff had received cheese spread

by Defendant Miron.  Prisoner Robinson told Defendant Miron that Plaintiff had refused to accept

the cheese and Defendant Miron stated that he did not "give a damn" about what the evidence

showed.  Defendant Miron indicated that it was irrelevant whether the cheese was Kosher or whether

Plaintiff took the cheese, that Plaintiff did not deserve to be on a Kosher diet because of his litigious

activities.  (*See* Plaintiff's Exhibit F, ¶¶ 3-4.)  Furthermore, prisoner Ervin Smith attests that on

January 19, 2007, while sitting outside Defendant Castello's office, he overheard Defendant Castello

tell Plaintiff that Defendant Maki was a friend of his and that he did not like Plaintiff because he had

"taken things to court."  Defendant Castello went on to tell Plaintiff that because of Plaintiff's

litigious behavior, he was going to have Plaintiff taken off his Kosher diet.  (*See* Plaintiff's Exhibit

D, ¶¶ 2-3.)

          In addition, Plaintiff offers a copy of a typed note from himself to Rabbi Jacob

Feinberg, asking whether cheese is necessarily non-Kosher just because it does not have a Kosher

symbol on it.  On the bottom of this note, there is a hand-written response which Plaintiff asserts is

from Rabbi Feinberg.  The response states that most cheese that could be purchased today is Kosher

"due to the process the way it is made."  This response is unsigned.  (*See* Plaintiff's Exhibit G.)

Plaintiff also offers a letter from Rabbi Feinberg, stating that he is a Rabbi at Congregation Bet

Shalom Israel in Norman, OK, and the director of the Jewish outreach organization "The

International Prison Yeshiva," which provides Biblical studies to incarcerated individuals interested

in making a sincere commitment to becoming observant in Jewish religious practices.  The letter

states:

          Azaryah Ben Ammi #184125 [Plaintiff] became an official
          member of The International Prison Yeshiva on March 23, 2006.  I
          have been in regular correspondence with him, advising him on

> religious matters.   In this time he has demonstrated to me his
> understanding of Jewish beliefs and dedication to Jewish practice.
> Paul has shown progress in his study of Jewish scriptures, including
> completing regularly the Correspondence Course lessons that I have
> sent to him and passing my examinations with excellent marks.   It is
> obvious that he is sincerely trying to follow the statutes and teachings
> of Judaism, and I fully support and endorse all of the requests that he
> is making.

(*See* Plaintiff's Exhibit H.)

In their reply to Plaintiff's response, Defendants state that while Plaintiff has offered affidavits from other prisoners in support of his assertion that Defendants are lying, they have offered not only their sworn affidavits, but copies of the NOI's, administrative hearing reports, affidavits of other prison officials, a copy of Plaintiff's store order form, and Plaintiff's own grievances regarding the incident.   Defendants assert that against this evidence, there is nothing to suggest that Defendants are lying and that a reasonable jury could not find in Plaintiff's favor.   However, the undersigned notes that the court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).   Under this standard, Plaintiff has succeeded in showing that there is an issue of fact regarding whether Defendants Castello and Miron retaliated against Plaintiff by having him removed from his Kosher diet in violation of his rights under the RLUIPA and the First Amendment.

Finally, Defendants Miron and Castello claim that they are entitled to qualified immunity on Plaintiff's claims.   Government officials, performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999); *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *Noble v. Schmitt*, 87 F.3d 157, 160 (6th Cir. 1996); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). An "objective reasonableness" test is used to determine whether the official could reasonably have believed his conduct was lawful. *Dietrich*, 167 F.3d at 1012; *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

The procedure for evaluating claims of qualified immunity is tripartite: First, we determine whether a constitutional violation occurred; second, we determine whether the right that was violated was a clearly established right of which a reasonable person would have known; finally, we determine whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights. *Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999).

When determining whether a right is clearly established, this court must look first to decisions of the United States Supreme Court, then to decisions of the Sixth Circuit and to other courts within this Circuit, and finally to decisions of other circuits. *Dietrich*, 167 F.3d at 1012. An official action is not necessarily protected by qualified immunity merely because the very action in question has not previously been held to be unlawful. Rather, in light of pre-existing law, the unlawfulness of the official's conduct must be apparent. *Dietrich*, 167 F.3d at 1012; *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

When making a qualified immunity analysis, the facts must be interpreted in the light most favorable to the plaintiff. Part of the analysis is to determine whether there are any genuinely disputed questions of material fact. *Kain v. Nesbitt*, 156 F.3d 669, 672 (6th Cir. 1998). Where there is a genuinely disputed question of fact, it is for the trier of fact to resolve, not the judge. "This

would be true notwithstanding that the trial judge found the [defendant] officer to be more credible

than the plaintiff because it is not for the court to make credibility determinations at this stage of the

proceeding." *Id.*

The operation of the qualified immunity standard depends substantially upon the level

of generality at which the relevant legal rule is to be identified.

> The contours of the right must be sufficiently clear that a reasonable
> official would understand that what he is doing violates that right.
> This is not to say that an official action is protected by qualified
> immunity unless the very action in question has previously been held
> unlawful, but it is to say that in light of the preexisting law the
> unlawfulness must be apparent.

*Anderson*, 483 U.S. at 639-40.  *See also Durham v. Nu'Man*, 97 F.3d 862, 866 (6th Cir. 1996), *cert.*

*denied*, 520 U.S. 1157 (1997).

The Sixth Circuit has observed:

> A right is not considered clearly established unless it has been
> authoritatively decided by the United States Supreme Court, the Court
> of Appeals, or the highest court of the state in which the alleged
> constitutional violation occurred.

*Durham*, 97 F.3d at 866 (citing *Robinson v. Bibb*, 840 F.2d 349, 351 (6th Cir. 1988)).

Thus qualified immunity is not triggered only where the very action in question was

previously held unlawful.  *Anderson*, 483 U.S. at 639-40.  Rather, the test is whether the contours

of the right were sufficiently clear that a reasonable official would understand that what he is doing

violated plaintiff's federal rights.  *Id.*

Furthermore, a defendant need not actively participate in unlawful conduct in order

to be liable under Section 1983.  Rather, a defendant may be liable where he has a duty to protect

a plaintiff and fails to comply with this duty.  *Durham*, 97 F.3d at 866-868 (holding that a nurse and

a security guard at a state hospital may be liable under Section 1983 where they do not take action

- 19 -

to prevent a patient from being beaten).  *See also McHenry v. Chadwick*, 896 F.2d 184 (6th Cir. 1990)(a correctional officer who observes an unlawful beating may be liable under Section 1983 even though he did not actively participate in the beating), and *Bruner v. Dunaway*, 684 F.2d 422 (6th Cir. 1982), *cert. denied sub nom*, *Bates v. Bruner*, 459 U.S. 1171 (1983)(police officers who stood by and observed an unlawful beating by fellow officers could be held liable under Section 1983).

When faced with a qualified immunity defense, the court must first determine whether or not the plaintiff has stated a claim upon which relief can be granted.  *Siegert v. Gilley*, 500 U.S. 226, 232 (1991); *Turner*, 119 F.3d at 429.  If the court answers that question in the affirmative, the court goes on to determine whether or not the right allegedly violated was clearly established. *Turner*, 119 F.3d at 429.  These are both purely legal questions.  The immunity issue should not be resolved if there are factual disputes on which the issue of immunity turns such that it cannot be determined before trial whether the defendants' conduct violated clearly established rights.  *Hall v. Shipley*, 932 F.2d 1147, 1154 (6th Cir. 1991).  Thus, where the underlying claim is one in which a certain motive or intent is an element, and plaintiff has made allegations which, if proven, will establish the existence of the necessary state-of-mind, a factual issue exists, preventing dismissal pursuant to Rules 12(b)(6) or 56.  *See Sanchez v. Sanchez*, 777 F. Supp. 906 (D.N.M. 1991).  In the Sixth Circuit, plaintiff need not include such allegations in his complaint, since in preparing his Complaint, he has no duty to anticipate affirmative defenses. *Dominique v. Telb*, 831 F.2d 673, 676 (1987).  However, once the affirmative defense is raised, plaintiff must come forward with such additional facts as would establish the requisite state of mind).  *Id.*

> Accordingly, when a plaintiff pleads his claim in generalized "notice" form, and the defense of qualified immunity is asserted through a motion to dismiss, the plaintiff is required to respond to that defense.

> If his original complaint is deficient in that regard, he must amend his complaint to include the specific, non-conclusory allegations of fact that will enable the district court to determine that those facts, if proved, will overcome the defense of qualified immunity.  For example, if the original complaint alleged that a police officer "used excessive force," and qualified immunity is asserted, then plaintiff would be required to amend with allegations of evidence sufficient to demonstrate that the force used against him was, indeed, unreasonable.  It is in this sense that a heightened standard attaches to plaintiff's pleading.

*Veney v. Hogan*, 70 F.3d 917, 922 (6th Cir. 1995).

In the opinion of the undersigned, when the issue is raised prior to the completion of discovery, the plaintiff must simply respond with specific allegations of fact adequate to survive scrutiny under Rule 12(b)(6) standards.  However, when the issue of motive is raised in the context of a motion for summary judgment following an adequate period of discovery, the amount of proof required is that quantum of evidence necessary to allow a jury to return a verdict in plaintiff's favor. *Crutcher v. Commonwealth of Kentucky*, 883 F.2d 502, 504 (6th Cir. 1989); *Hull v. Cuyahoga Valley Joint Vocational School District Bd. of Education*, 926 F.2d 505 (6th Cir.), *cert. denied sub nom.*, *Hull v. Shuck*, 501 U.S. 1261 (1991).  *Cf. Poe v. Haydon*, 853 F.2d 418, 424 (6th Cir. 1988), *cert. denied*, 488 U.S. 1007 (1989) (to avert dismissal short of trial, plaintiff must come forward with something more than inferential or circumstantial support for his allegation of unconstitutional motive).  A plaintiff will defeat a defense of qualified immunity if he can present sufficient evidence to prove the existence of a genuine issue of material fact regarding the issue of immunity or if the undisputed facts show that defendant violated plaintiff's clearly established rights.  *Noble*, 87 F.3d at 161.

In this case, as noted above, Plaintiff attaches the affidavits of himself, fellow prisoners, and a letter from his Rabbi.  In the opinion of the undersigned, Plaintiff has sustained his

burden of proof in response to Defendants' motion for summary judgment.  Accordingly, it is recommended that the Motion for Summary Judgment filed by Defendants Miron and Castello (Docket #30) be denied.

NOTICE TO PARTIES:  Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b).  Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985).


 /s/ Timothy P. Greeley
TIMOTHY P. GREELEY
UNITED STATES MAGISTRATE JUDGE

Dated:  May 29, 2009